**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

BIS INDUSTRIAL SERVICES, INC., )
 )
Plaintiff, )
 )
vs. )
 ) CASE NO.
MARK MASSEY, JOHN TODD ROBERTSON, and JLM ADVANCED TECHNICAL SERVICES, INC., )
 )
Defendants. )

**VERIFIED COMPLAINT**

Plaintiff BIS Industrial Services, Inc. ("BIS") files this Verified Complaint against Defendants Mark Massey ("Massey"), John Todd Robertson ("Robertson"), and JLM Advanced Technical Services, Inc. ("JLM"), and shows the Court as follows:

## I. INTRODUCTION

1. BIS brings this lawsuit against former employees Massey and Robertson, and BIS' competitor JLM, for their actions to unfairly and unlawfully appropriate BIS' employees and business. JLM conspired with Massey and Robertson, inducing them to breach their employee duty of loyalty to BIS, to misappropriate BIS' confidential and trade secret information and to engage in a concerted effort to usurp BIS' long-standing maintenance contract with Buckeye Technologies, Inc. ("Buckeye") for Buckeye's plant in Perry, Florida (the "Buckeye Plant"). Defendants have unfairly and unlawfully used BIS' relationships, goodwill, and confidential information to induce Buckeye to terminate its contract with BIS, and to solicit employees to leave BIS to join JLM. JLM has knowingly used Massey and Robertson, while they were still employed by BIS, to subvert BIS' longstanding relationship with Buckeye, to

create discord among BIS' employees, and to misappropriate BIS's confidential information and good will within the industry. Massey has egregiously breached of his duty of loyalty to BIS, misappropriated BIS' confidential information, and engaged in unfair and deceptive trade practices. Robertson has followed Massey in also breaching his duty of loyalty to BIS and engaging in unfair and deceptive trade practices. JLM's conduct constitutes tortious interference with BIS' contracts and business relations, misappropriation of confidential information, and unfair and deceptive trade practices.

2.      BIS has been seriously and irreparably damaged by Defendants' conduct. BIS brings this lawsuit asking this Court for injunctive relief to prevent any further harm, and seeking monetary damages for that harm that has already occurred, or that is not redressible in equity.

## II.      THE PARTIES

3.      Plaintiff BIS is a corporation organized under the laws of the State of Delaware, with its principal place of business in Missouri.

4.      Upon information and belief, Defendant JLM is a corporation organized under the laws of the State of Wisconsin, with its principal place of business at 1400 N. Rankin Street, Appleton, Wisconsin 54911.

5.      Defendant Massey is an individual and a resident of the State of Florida.

6.      Defendant Robertson is an individual and a resident of the State of Florida.

## III.      JURISDICTION AND VENUE

7.      This is an action for injunctive relief, or damages in excess of $75,000, exclusive of interest and costs.

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

9.     Defendants are subject to personal jurisdiction in the State of Florida because JLM operates, conducts, engages in, and carries on business in the State of Florida; Massey is a citizen and resident of the State of Florida; Robertson is a citizen and resident of the State of Florida, and all Defendants committed various unlawful acts in the State of Florida causing harm to BIS in the State of Florida.

10.     Venue is proper in the Northern District of Florida under 28 U.S.C. §1391 because Defendants Massey and Robertson reside in the Northern District of Florida and a substantial part of the events giving rise to the claim arose in the Northern District of Florida.

## IV.     FACTS

### A.     BIS' and JLM's Business.

11.     BIS provides maintenance services to keep industrial production facilities operating at peak-efficiency.  BIS places it employees at customers' locations to identify, address, and resolve production issues, and to provide comprehensive preventative maintenance services, program development, management, and support.

12.     BIS has extensive experience providing such services to manufacturers in the pulp and paper industry, including experience in its work with Buckeye.

13.     Buckeye's Plant in Perry, Florida, produces specialty cellulose from slash pine to produce a variety of cellulose products for use in the manufacture of rayon, tire cord, sausage casings, filter papers, diapers, and sanitary products.

14.     BIS has serviced Buckeye's specialized pulp production operations in Perry under a contract since 2003; however, the roots of that relationship run far deeper.  The company BIS acquired in 2003 serviced the Buckeye Plant for Buckeye or its predecessor since 1954.

15.     JLM advertises that it provides consulting, mechanical, and testing services, specializing in the pulp and paper industry.

16. JLM is a direct competitor, competing against BIS in the pulp and paper maintenance and production support services industry.

**B. Massey's Employment with BIS.**

17. Massey began his employment with BIS in 2003 when BIS acquired Massey's previous employer. Massey has worked for BIS or its predecessor at the Perry, Florida location of Buckeye or its predecessor since 1979.

18. During the time Massey engaged in the unlawful acts alleged herein, Massey was employed by BIS as the BIS Site Manager at the Buckeye Plant in Perry, Florida.

19. In his capacity as Site Manager, Massey was responsible for managing BIS' onsite workforce of over 200 employees to carry out all of BIS' site construction, engineering, and maintenance functions under BIS' contract with Buckeye. Massey was also responsible for monitoring and controlling site standards for safety, quality, schedule, cost and sustainability; representing BIS in project meetings with Buckeye; managing financial aspects of contracts to protect BIS' interest; and maintaining BIS' relationship with Buckeye.

20. Massey served as the direct contact between BIS' site team and Buckeye. As Site Manager, Massey was the face of BIS with Buckeye.

21. Throughout his employment, Massey has signed his receipt, acknowledgment, and commitment to adhere to BIS' Code of Conduct, Integrity Guideline, Competition Guideline, and Third Party Guideline. Massey signed his pledge to conform to these obligations as recently as November 15, 2012. (Gregerson Decl. ¶ 4, Ex. A.)

22. Massey also signed his receipt, acknowledgment, and commitment to adhere to BIS' Code of Ethics and Business Conduct on March 19, 2007 and April 10, 2008, and BIS' Internet and Electronic Messaging Services Policy on July 28, 2009. (Gregerson Decl. ¶ 5, Exs. B, C, and D.)

23. Among other things, these BIS policies establish codes of ethical business conduct and protections of BIS' confidential information.

24. As Site Manager, Massey was not only responsible for complying with these policies, but ensuring that the BIS employees under his management also complied with them. (Gregerson Decl. ¶ 6.)

25. As Site Manager, Massey had access to all of BIS' operational information relating to the Buckeye Plant -- its pricing and pricing methods; its information about its Buckeye relationship, including Buckeye preferences and requirements; wage rates and benefits for BIS onsite employees; BIS' labor costs and man-hours for all facets of BIS' operations at the Plant; cost of inputs, overhead, and materials; and the library of BIS' maintenance, performance, and diagnostic information regarding equipment and operations serviced by BIS at the Buckeye Plant. This information is confidential and proprietary.

26. Massey's duties placed him in a position of unique trust and confidence. Massey's position allowed him to develop and guide BIS' onsite operations and relationships with Buckeye and BIS employees, and gave him virtually unlimited access to BIS' confidential, proprietary, and trade secret information relating to BIS' Buckeye contract.

27. Massey also had unique and particular knowledge about the skill levels, compensation and benefits, and customer relationships held by all BIS employees working on the Buckeye contract.

**C. Massey and JLM Actively Undermine BIS' Contract with Buckeye.**

28. In direct breach of his duty of loyalty to his employer, on information and belief, beginning as early as September, 2012, Massey began attacking BIS behind the scenes with Buckeye's management, by detailing his grievances with BIS and what he perceived as shortcomings in BIS' service of the Buckeye contract.

29.     On information and belief, Massey delivered to Buckeye management an extensive description of his complaints about the BIS' "Organization" (i.e., complaints about the BIS company or its senior management, as compared to BIS' site operations at the Buckeye Plant) in a memo entitled "SITE CONCERNS WITH BIS ORGANIZATION" (the "Concerns Memo") (Bauman Decl. ¶¶ 14-19, Exs. A-F; Gregerson Decl. ¶ 26, Ex. F.)  Six separate drafts of Massey's Concerns Memo are located on the thumb drive BIS Information Technology Manager Dan Bauman found connected to the computer in Massey's office on the date BIS terminated Massey (the "Massey Thumb Drive").  (Bauman Decl. ¶¶ 14-19, Exs. A-F.)  BIS Human Resources Director Stacy Gregerson also found a hardcopy of Massey's Concerns Memo containing handwritten notes on Massey's desk at the time of his termination.  (Gregerson Decl. ¶ 26, Ex. F.)

30.     The most complete and apparently final draft of Massey's Concerns Memo contains a litany of Massey's grievances with BIS and a proposed solution.  Massey was proposing that Buckeye cancel the long-time contract with BIS and award a new contract to a different service provider that would be led by Massey and staffed by the BIS employees currently working at the Buckeye Plant.  (Bauman Decl. ¶ 19, Ex. F.)

31.     Many of Massey's "concerns" in Massey's Concerns Memo related primarily to himself and other "key site management."  (Bauman Decl. ¶ 19, Ex. F.)  The Concerns Memo was essentially Massey's self-serving justification for stealing BIS' contract and BIS' employees at the Buckeye Plant to shift the BIS contract to JLM and procure greater rewards for himself.

32.     For example, Massey complained bitterly to Buckeye management that "[BIS] Site management does not feel they are part of the larger BIS organization."  In one bullet point after another he hammered BIS's corporate management:  "Site Management does not feel

valued or appreciated for their contributions to the site"; "No incentives for key management personnel"; "No site input to corporate policy changes that affect the site"; "Decisions are made at the corporate level that directly affects the site with No input from the site or the Operational Managers. (Health insurance, Safety/Risk Manager replacement, etc.)"; "All profits go straight to the bank in Germany and are not shared with Key Management Employees"; "Morale is down due to NO Recognition or Reward program for Key Management personnel." (Bauman Decl. ¶ 19, Ex. F.)

33.    Although he was the BIS Site Manager and owed a duty of loyalty to BIS, Massey offered Buckeye a solution for these concerns (and for his own self-advancement) by advocating that Buckeye cancel its contract with BIS and "transition site operations to JLM". (Bauman Decl. ¶ 19, Ex. F.)

34.    Massey concluded his analysis in his Concerns Memo, telling Buckeye management that, "In the past I have wanted to discuss these issues with you, but had no good alternative for you that gave [Buckeye] a win for making the change. I feel that I do know [sic] and would like to discuss those opportunities next." (Bauman Decl. ¶ 19, Ex. F.)

35.    Massey's Concerns Memo goes on to detail the advantages to "transitioning" the contract from BIS to JLM. Among the benefits JLM could offer with Massey's leadership, Massey listed, "Willing to commit a percentage of the profits for profit sharing to Key Management employees"; "Wants to model the [Buckeye]/onsite contractor relationship to sell to other companies"; "Willing to accept existing contract"; and "No increase cost to [Buckeye]." (Bauman Decl. ¶ 19, Ex. F.)

36.    On information and belief, JLM also participated in drafting and revising Massey's Concerns Memo, in preparation for Massey sending it on to Buckeye management.

Massey and JLM exchanged at least two drafts before finalizing the memo for Buckeye management's consumption, which drafts Massey had stored on the Massey Thumb Drive, recovered at the time of his termination. (Bauman Decl. ¶¶ 16-17, Exs. C and D.)

37.     These drafts show close cooperation between Massey and JLM to undermine BIS' contract and business relationship with Buckeye from the inside.

38.     Upon information and belief, on or about October 29, 2012, Massey delivered to Buckeye management a follow up memo, which Massey saved as "Beat the table.docx" on the Massey Thumb Drive, in which Massey passionately argues the futility of Buckeye attempting to approach BIS to remedy the purported issues Massey raised in his Site Concerns Memo. (Bauman Decl. ¶¶ 20-21, Exs. G and H.)

39.     The Beat the Table Memo posed a pointed rhetorical question to Buckeye: "Bid out the Contract or have the Client go and Beat on the table for BIS to improve?" (Bauman Decl. ¶¶ 20-21, Exs. G and H. (emphasis in the original))

40.     But Massey did not leave it for Buckeye to decide between these alternatives. Massey starkly informed Buckeye that the "beat on the table approach" – the approach ostensibly by which Buckeye and BIS' management, presumably including Massey, would talk with each other and work to address any Buckeye "concerns" at the Perry location, and thus maintain the Buckeye contract – was not worth pursuing. (Bauman Decl. ¶¶ 20-21, Exs. G and H.)

41.     Massey pounded away, attacking BIS: "I don't believe you will change a company [sic] core values by beating on the table. This situation is not new but has been going on since 2003. I have worked these issues repeatedly with [BIS business manager] David [Tweedie], with no response." (Bauman Decl. ¶¶ 20-21, Exs. G and H.)

42. Massey vented his own resentment and anger at BIS to Buckeye in the Beat the Table letter without holding back: "my group has spent their careers making Buckeye successful. For the last (9) years their efforts have not been appreciated or rewarded by BIS. (I don't think you can change this by beating on the table) [Defendant John Todd Robertson] and I have spent the last 30 + years 7/24/365 making Buckeye successful. <u>What has BIS done to deserve this site?</u>" (Bauman Decl. ¶¶ 20-21, Exs. G and H) (emphasis original).

43. Massey also undercut any thought that Buckeye should ask BIS to address these issues, and preemptively criticized BIS for how he said BIS would respond: "Any token of appreciation that BIS may give [to employees at the Perry location] after the "beating on the table" talk would be added cost to Buckeye." (Bauman Decl. ¶¶ 20-21, Exs. G and H.)

44. Then, in an attempt to shield himself from blame for seeking more for himself or for now stabbing BIS in the back, Massey offered this apology: "I did not come to you to fight my battles, but only to inform you of the critical situation. [Defendant Todd Robertson] and I have decided not to work for BIS in the future. Our decision was made in August and conveyed to our Buckeye contacts, our hope was that by us taking the step to inform you of the situation we could make a change and make it better for all of our employees at this site. (Bauman Decl. ¶¶ 20-21, Exs. G and H.) Massey is essentially saying that for months he had decided to leave BIS, and now he is working, while still a BIS employee, to "make a change," -- and shift the Buckeye contract to a different company where he can get what he wants.

45. In direct breach of his duty of loyalty to BIS, Massey attacked BIS behind its back, with Buckeye using his Concerns Memo and the Beat the Table Memo to criticize the BIS and to advocate that Buckeye terminate its agreement for services with BIS.

**D. Massey's and Robertson's Offers from JLM.**

46. On September 6, 2012, JLM delivered to Massey a formal offer of employment to join JLM as Site Manager "reporting to Bruce Truskowski, VP and General Manager of JLM Advanced Technical Services." (Bauman Decl. ¶¶ 22, Ex. I.)

47. On September 18, 2012, after JLM's formal offer letter had come to Massey, both Massey and Robertson completed JLM employment applications. (Bauman Decl. ¶ 23, Ex. J; Gregerson Decl. ¶ 22, Ex. E.)

48. On his employment application for JLM, Robertson listed Massey as a reference. (Gregerson Decl. ¶ 22, Ex. E.) Massey's application listed Buckeye management Earle Greene, Ben Crowe, and Karl Stoyer as references. (Bauman Decl. ¶ 23, Ex. J.)

49. Massey did not inform anyone at BIS that he had received a formal offer from JLM or that he had accepted that offer. Massey continued in his employment with BIS as the Buckeye Plant site manager, all the while working to advance JLM interests in taking over the Buckeye contract and laying the groundwork to hire BIS employees at the plant, to staff it.

50. Despite JLM's knowledge that Robertson was an active BIS employee at the time, and that Robertson would continue to work at the Perry site for BIS for at least until Buckeye moved the maintenance contract, JLM furthered the campaign to undermine BIS from the inside, and on September 20, 2012, JLM made a formal offer of employment to Robertson to serve as Maintenance Manager at a base salary of $105,000. (Bauman Decl. ¶ 24, Ex. K.)

51. After receiving his formal offer letter from JLM, Robertson developed second-thoughts about joining JLM. However, Massey and James Hickman ("Hickman"), JLM's Vice-President of Operations and part owner, convinced Robertson to continue to aid in the conspiracy to usurp the BIS contract with Buckeye and join JLM. (Bauman Decl. ¶ 25, Ex. L.)

52. On October 6, 2012, Massey e-mailed Hickman stating, "Thank you for your time yesterday, I appreciate you taking time talking with [Robertson] and I after lunch. This made [Robertson] feel a lot more comfortable and <u>he is key to help make this happen</u>. I know I may have been forward but I did not have much time to get [Robertson] feeling good about the transition." (Bauman Decl. ¶ 25, Ex. L) (emphasis added).

53. As evidenced by this e-mail from Massey to Hickman, Massey and JLM were working together to "<u>make this happen</u>" – by which they meant the takeover of the Buckeye contract and the poaching of BIS employees at the Buckeye Plant – and Massey regarded the recruitment of his second in command as a key next step.

54. Accordingly, on December 4, 2012, JLM sent Robertson a new offer letter, this time offering an additional $20,000 in base salary and an additional 104 hours of vacation. (Bauman Decl. ¶ 26, Ex. M.)

**E. Massey and the Contract Cancellation Letter.**

55. In October 2012, Massey continued his campaign to induce Buckeye to cancel its contract with BIS. On information and belief, Massey and JLM's conspiracy was successful to induce Buckeye to terminate its long-standing contract with BIS and open the contract for bidding.

56. In November 2012, Buckeye gave BIS notice of its intent to cancel its long-standing contract with BIS, and to put out the service contract for bidding among competitors. Although ostensibly drafted by Buckeye Vice President and Perry site manager, Howard Drew ("Drew"), upon information and belief, Massey substantially authored and revised multiple drafts of Buckeye's cancellation letter (the "Contract Cancellation Letter") to be sent to his own employer, BIS. (Bauman Decl. ¶¶ 27-28, Exs. N and O.)

57.     At the time of his termination, Massey left behind a draft of the Contract Cancellation Letter entitled "BIS Letter MAM Revision.docx," which contains Massey's further self-serving attacks on BIS while crediting his own performance.  (Bauman Decl. ¶ 28, Ex. O.) On information and belief, "MAM" refers to Defendant Mark A. Massey.

58.     Massey's revisions to the letter add explicit criticisms of BIS as justification for cancellation of the Buckeye contract.  Once again he wanted to point out he was underpaid and underappreciated.   Specifically, Massey identified the "Increasing challenge of attracting, developing, and retaining qualified higher level BIS personnel, due to the very limited career paths and opportunities available beyond the site.  Limited current benefits and incentives for key personnel also contribute to this problem."  Other versions of the Contract Cancellation Letter do not include any reason for cancellation or any criticism of BIS' performance. (Compare Bauman Decl. ¶ 27, Ex. N to Ex. O.)

59.     At the same time, Massey was careful to add language to his criticisms of BIS shortcomings that made it clear that no one on the site should be blamed for any of this (least of all Massey), and that the site staff were fully meeting the needs of Buckeye:

> In no way should the decision to bid out this contract be construed that the onsite personnel are not meeting the current day-to-day needs of the owner.

(Bauman Decl. ¶ 28, Ex. O.)  In sum, on every occasion, Massey made an effort to reinforce for Buckeye the virtues of throwing BIS overboard but keeping Massey and the other site employees, by moving the contract to some competitor.

### F.      Massey and JLM Solicit BIS' David Tweedie.

60.     On November 28, 2012, BIS Southeast Regional Manager, David Tweedie, travelled to the Buckeye location for what he believed to be a routine visit.  However, after

arriving, Massey handed Tweedie the Contract Cancellation Letter, cancelling the BIS contract with Buckeye and announcing Buckeye's intent to open for bid a new contract for the maintenance services BIS performed. (Tweedie Decl. ¶ 2.)  He did not tell Tweedie that he had been involved in writing it.

61.     Massey then explained to Tweedie that he had been talking with JLM, who was planning to bid for the contract.  Massey informed Tweedie that JLM wanted to hire Tweedie and other BIS employees to run the Buckeye Perry, Florida, location for JLM and to help JLM in taking over BIS's operations throughout the southeast.  Massey told Tweedie that they would get a better deal if they were to work for JLM.  (Tweedie Decl. ¶ 3.)

62.     Massey told Tweedie that Massey had been dealing with Hickman.   On a whiteboard, Massey set out JLM's business plans for Tweedie.  Massey said that JLM promised to share the fee it earned from Buckeye if it was awarded the BIS contract.  (Tweedie Decl. ¶ 3.)

63.     Massey told Tweedie that he had known about Buckeye's plans to terminate the BIS contract weeks before November 28, 2013, but did not tell anyone.  (Tweedie Decl. ¶ 4.)

64.     Massey asked Tweedie to meet with Hickman the following week to discuss opportunities at JLM.  Tweedie told Massey that Tweedie thought his actions were illegal, but Massey told Tweedie, "I think I will be okay."  (Tweedie Decl. ¶ 4.)

65.     Tweedie and Massey then met with Drew, during which meeting Drew informed Tweedie that the primary reason Buckeye decided to cancel the BIS contract was purported BIS employee complaints that BIS did not properly support and value its employees.  Drew claimed that the decision was secondarily based on BIS not upgrading the VCCS system and BIS' alleged failure to acquiesce to Buckeye's demands regarding an indemnity clause.  (Tweedie Decl. ¶ 5.)

66.     Drew made clear that the reason to cancel the BIS contract had nothing to do with the quality of BIS's work at the Buckeye plant.  Drew also stated that Buckeye was happy with BIS's Tallahassee operations. (Tweedie Decl. ¶ 5.)

67.     To Tweedie, Drew appeared uncomfortable and evasive during this meeting. Drew said that BIS could bid for the Buckeye contract and that BIS' proposal would be considered fairly.  (Tweedie Decl. ¶ 5.)

68.     Tweedie was very surprised by Buckeye's reasons for cancelling BIS contact and asked why Buckeye never previously raised concerns to BIS.  Drew answered by saying that he thought discussions regarding Buckeye's issues with BIS were futile.  (Tweedie Decl. ¶ 6.)

69.     Drew's purported reasons for terminating the BIS contract, never previously expressed to BIS, are identical to those first raised by Massey, with JLM's input, to Buckeye.

70.     Drew's contention that making any prior attempt to rectify any issues Buckeye may have had with BIS would be useless parrots Massey's writing to Buckeye in the Beat on the Table Memo on the futility of "beating on the table."

71.     Drew also told Tweedie that BIS could not take any action or retaliation toward any employees that BIS believed were the source of the complaints to Buckeye.  (Tweedie Decl. ¶ 6.)

72.     This instruction from Drew put BIS in the position in which it could not take action to deal with Massey's apparent disloyalty without jeopardizing its chances to retain the contract.  Drew had also said that BIS could compete for the contract, under the bidding process, for which Drew said BIS would be considered "fairly." (Tweedie Decl. ¶ 7.)   In the meantime, BIS' approach had to be to maintain good continuity in its provision of services to Buckeye and

to gather more information about what Massey and JLM had done at the Buckeye Plant and with BIS employees.

73.     On December 4, 2012, Tweedie traveled back to Perry, Florida to meet with Hickman and Massey.  (Tweedie Decl. ¶ 8.)

74.     Tweedie decided to attend this meeting for the purpose of acquiring more information about Massey's and JLM's unfair competition and misappropriation of BIS information.  Prior to making this trip, Tweedie first cleared the meeting with BIS CEO, David Hile, and BIS' ethics ombudsman.  (Tweedie Decl. ¶ 8.)

75.     During Tweedie's meeting with Hickman and Massey it was clear to Tweedie that Massey had disclosed confidential BIS documents to Hickman because Hickman knew such confidential BIS information as BIS' engineering multipliers, the BIS employee pay scale, and all of the names of BIS employees at the BIS Tallahassee office.  (Tweedie Decl. ¶ 8.)

76.     Hickman wanted Tweedie to join JLM, and informed Tweedie of JLM's plans to take over BIS' Tallahassee office, then target BIS's operations in Albany, Georgia and BIS' contract with Weyerhaeuser to service its plant in Oglethorpe, Georgia.  (Tweedie Decl. ¶ 8.)

77.     After meeting with Hickman and Massey, Massey told Tweedie that JLM had approached Massey the previous summer when JLM was at the Buckeye plant servicing a piece of machinery that suffered a catastrophic failure.  JLM initially asked Massey to leave BIS and work for JLM.  However, Massey said that the plan changed to JLM vying to take the BIS contract for the Buckeye plant.  (Tweedie Decl. ¶ 9.)

### G.     Massey Drives Buckeye's "Bid" Process to Replace BIS with JLM.

78.     Massey's efforts did not end at inducing Buckeye to cancel its contract with BIS. While he continued in BIS' employ, upon information and belief, Massey nonetheless aided

Buckeye in preparing a request for proposals (the "RFP") for those bidding on the contract for maintenance and construction services at the Buckeye Plant, and shaped the RFP to fit his plans to move the contract to JLM.  (Bauman Decl. ¶¶ 29-30, Exs. P and Q.)

79.     On information and belief, Massey shaped the Buckeye RFP and the bidding process that followed to provide unfair advantages for JLM and to induce Buckeye to award the contract to JLM.

80.     As the Buckeye RFP makes clear, the successful bidder must employ BIS' existing workforce and maintain or improve on the existing BIS wage and benefits package.

81.     Put simply, to secure the Buckeye contract, Buckeye requires that the successful bidder take on substantially all current BIS employees at the Buckeye Plant, and provide them with at least the same if not better compensation and benefits as compared those currently provided by BIS.

82.     On information and belief, based on documents Massey left behind at the time of his termination, it was Massey that revised the original Buckeye RFP to impose and develop this requirement.  (Bauman Decl. ¶¶ 29-30, Exs. P and Q.)

83.     Indeed, not only is this requirement set forth in Buckeye's RFP, but Buckeye went so far as to include appendices to that RFP detailing BIS' compensation and benefits by employer, to the penny and by provider.

84.     Buckeye will formally award the contract on or before March 31, 2013.

85.     On information and belief, Massey provided this information to Buckeye when he made his January 16, 2013 revisions to the Buckeye Request for Proposal.  (Bauman Decl. ¶ 31, Ex. R.)

86.     On information and belief, this and other BIS confidential, proprietary, and trade secret information was provided to Buckeye by Massey, in connection with Massey's efforts to shape its RFP and its publication to BIS' competitors has resulted in irreparable harm to BIS.

87.     On information and belief, Massey also was closely involved in the internal processes at Buckeye for evaluating the bidders who were responding to the RFP.

88.     At the time of his termination, Massey left behind a memorandum, dated February 19, 2013, to Earle Greene, Buckeye's Resident Engineer and primary liaison between BIS and Buckeye, criticizing the proposals from bidders Yates and URS, while extolling the virtues of JLM.  (Gregerson Decl. ¶ 27, Ex. G.)

89.     On information and belief, Massey had secured assistance from Greene, which he was using on behalf of JLM to help JLM obtain the Buckeye contract, as evidenced by Greene's providing Massey confidential, internal Buckeye correspondence and information regarding the proposal and decision process.  (Bauman Decl. ¶ 32, Ex. S.)

**H.     JLM and Massey Target BIS Regional Leadership.**

90.     On information and belief, Massey and JLM intended and do intend to take the Buckeye contract from BIS, and then to service the Buckeye contract using current BIS employees and confidential information.

91.     To that end, Massey has engaged in a campaign to align current BIS employees at the Buckeye Plant, including but not limited to Robertson, Allen Bishop, and Shawn Hudson, to join him at JLM to help JLM secure the Buckeye contract.

92.     Massey's solicitation of BIS employees includes not only those employees over whom he has supervisory responsibilities, but also BIS regional executives located in Georgia and in the Tallahassee, Florida area.

93. On or about December 7, 2012, Massey called BIS' Site Manager at its customer Weyerhaeuser's Oglethorpe, Georgia plant, Glenn Kemp. Massey told Kemp that JLM had approached him about the opportunity grow JLM's business in the Southeastern United States. Massey told Kemp that JLM offered site managers better bonuses and compensation than BIS, and that JLM would offer Kemp an opportunity to get in on the ground floor of a new division of JLM. (Kemp Decl. ¶ 2.)

94. Massey made clear to Kemp that JLM was attempting to hire BIS upper level employees who could bring over additional BIS employees to build JLM's operations. (Kemp Decl. ¶ 4.)

95. On December 19, 2012, Kemp met with BIS Southeastern Regional Controller, Otto Liggin, and BIS Albany Regional Manager, G. Tim Thompson, at Thompson's house. (Kemp Decl. ¶ 5; Liggin Decl. ¶ 7; Thompson Decl. ¶ 2.)

96. While meeting, Kemp received a text from Massey asking the group to join a call with Massey and Hickman. Kemp, Liggin, and Thompson agreed. (Kemp Decl. ¶ 5; Liggin Decl. ¶ 8; Thompson Decl. ¶ 3.)

97. During the call, Hickman said that JLM had a lot of contacts at paper plants, but needed a construction group to expand JLM's services. Hickman told the group that JLM would match or beat BIS' benefits. (Kemp Decl. ¶ 6.)

98. Hickman suggested that he meet personally with Kemp, Liggin, and Thompson. After discussing among themselves, however, the group decided they were not comfortable with JLM's and Massey's conduct and plans, and informed Massey they were not interested in working for JLM. (Kemp Decl. ¶ 7; Liggin Decl. ¶ 14; Thompson Decl. ¶ 8.)

99.     Based on the December 7 and 19, 2012 calls, Kemp understood that. Massey was working on behalf of JLM to recruit BIS employees.  (Kemp Decl. ¶ 10.)

100.     Massey has also provided JLM with confidential information regarding the complete compensation and benefits packages for BIS employees, including insurance carriers and employee premium contributions down to the penny, for the purpose of aiding JLM in hiring away BIS employees and securing the Buckeye contract.

101.     Massey has also solicited, secured, and directed BIS employees to work on projects on behalf of JLM including, on information and belief, JLM projects in Georgia and South Carolina.

102.     Upon information and belief, in late-2012, Massey approached Bishop, BIS Superintendent at Buckeye plant, and other BIS superintendents to perform side work for JLM.

103.     Upon information and belief, in early February, Robertson informed Bishop that JLM needed to have a job in South Carolina looked at to be estimated.  Robertson provided Bishop with a JLM employment application, which Bishop completed and returned to Robertson. (Bauman Decl., ¶ 35, Ex. V.)

104.     Upon information and belief, on February 6-8, 2013 Bishop used BIS vacation days to travel with Robertson to a Georgia-Pacific plywood plant in Allendale, South Carolina and a plant in Brunswick, Georgia to estimate the time and labor needed to conduct some maintenance work that JLM was scheduled to perform during upcoming outages at the plant.  I understood that I would be bringing employees from Perry to do this work for JLM in the near future and was doing the planning and estimating with that in mind.

105.     Massey and JLM also solicited BIS Senior Mechanical Engineer, Allen Eppinger. In December, 2012, Massey called Eppinger offering a position with JLM.  (Eppinger Decl. ¶ 2.)

106. Massey told Eppinger that Massey believed that, if Eppinger joined JLM, other employees in Eppinger's BIS Tallahassee, Florida group would also join JLM. Eppinger understood from Massey that JLM intended to obtain BIS' entire Tallahassee office, and Massey wanted Eppinger to help him accomplish that. (Eppinger Decl. ¶ 3.)

107. Massey tried to have Eppinger commit to working for JLM prior to JLM submitting its proposal to Buckeye to improve JLM's prospects of obtaining BIS' contract at the Buckeye plant. (Eppinger Decl. ¶ 4.)

108. Eppinger understood that Massey was seeking to have Eppinger commit to JLM prior to JLM submitting its proposal to Buckeye because JLM did not have design/engineering capacity and needed Eppinger and his team to fill that need, and that would help JLM pitch for the Buckeye contract in competition with BIS keeping the contract. (Eppinger Decl. ¶ 4.)

109. Eppinger chose not to join JLM due to questions about JLM and the contract with Buckeye. (Eppinger Decl. ¶ 6.)

110. At all times, Massey, Robertson, and JLM were acting in concert as part of a conspiracy to divert BIS business and employees for the benefit of JLM and to the detriment of BIS.

**I. BIS Terminates Massey and Robertson.**

111. After gathering information from its employees about this situation, and planning its process for maintaining continuity in continued services to Buckeye, BIS terminated Massey and Robertson on February 26, 2013, as a response to their unlawful and disloyal conduct. (Tweedie Decl. ¶ 12.)

112. Tweedie was a part of the BIS team that went to the Buckeye plant to terminate Massey. The team included Stacey Gregerson ("Gregerson"), the BIS Director of Human

Resources; Dan Bauman ("Bauman"), the BIS Information Technology Manager; Karen Schenkelberg ("Schenkelberg"), BIS' Operations Manager.

113.   After meeting briefly with Massey, Tweedie informed Massey that Massey's employment was terminated, effective immediately.   Tweedie and Gregerson retrieved Massey's phone, company credit card, and the keys to the Company vehicle assigned to Massey. (Tweedie Decl. ¶ 12; Gregerson Decl. ¶¶ 10-11.).   Massey refused to return the keys to the BIS offices at the Buckeye Plant.

114.   Tweedie accompanied Massey to the Buckeye Plant's outer gate, where Massey was picked up by his son. (Tweedie Decl. ¶ 12.)   On the walk to the gate, Tweedie asked Massey for the passwords to his work computer, but Massey refused, stating, "y'all may be playing this game, but I am not." (Tweedie Decl. ¶ 12.)

115.   Gregerson, Schenkelberg, and Bauman, inspected Massey's office, collected his work papers and secured his computer files. (Tweedie Decl. ¶ 13; Bauman Decl. ¶¶ 2-34; Gregerson Decl. ¶¶ 15-19.)   Bauman also recovered a thumb drive from Massey's office containing BIS and JLM documents. (Bauman Decl. ¶¶ 7.)

116.   At the time of Massey's termination, a Microsoft Word document with the file name "Onsite Contractor RFP 02252013-JLM Edits" was open on Massey's computer. (Bauman Decl. ¶ 5.)   The file entitled "Onsite Contractor RFP 02252013-JLM Edits" is JLM's draft proposal, prepared with the assistance of Massey, in response to Buckeye's RFP.   At the time he was called away to be terminated Massey was thus working on JLM's Response to the Buckeye RFP.

117.   Gregerson and Tweedie then interviewed Robertson, and suspended Robertson pending further investigation. (Gregerson Decl. ¶ 20.)

118.   However, when Tweedie, Bauman, and Gregerson inspected Robertson's office, they found hard copies of various documents, including a copy of his application for employment with JLM.  (Gregerson Decl. ¶ 22, Ex. E.)

119.   Robertson's computer also contained numerous JLM-related documents, files and materials, including expense reports for work he performed on JLM's behalf while in BIS' employ.  (Gregerson Decl. ¶ 21; Bauman Decl. ¶¶ 12-13.)

120.   The correspondence on Robertson's computer included, among other things:  (1) e-mails dated February 2, 2013 to JLM from Robertson containing Robertson's and Bishop's time records and Robertson's expense report; (2) an email dated January 25, 2013 to a JLM e-mail  address (mcammenga@jlmservices.net), from Robertson containing a BIS proprietary work planning document, "bark dry platform.xlsm."; and (3) an email from Massey forwarding employment application materials, including a W-4 form and a background check form, from JLM to Robertson.  (Bauman Decl. ¶ 12.)

121.   The "bark dry platform" document is an excel spreadsheet document containing an estimate of effort required to make modifications and additions to a piece of equipment at the Buckeye facility.

122.   On Robertson's computer, Bauman also found multiple e-mail messages, dated February 18, 2013, sent by Robertson to what appears to be a personal email address for himself, jtr124@hotmail.com, containing an electronic copy of BIS's Bogey Manual.  (Bauman Decl. ¶¶ 12-13.)  A "Bogey Manual" contains information concerning estimating standards used by BIS to calculate estimate costs of work.  Any person or company possessing this information would then have knowledge of how BIS would construct a competitive proposal.

123.    Upon information and belief, Robertson sent the Bogey Manual to Dustin Combs at Weldco, LLC d/b/a Weldco Services in Florida, which is an affiliate of JLM and has substantially identical management and ownership.

124.    Based on the JLM-related documents in Robertson's office and on his computer, and indications that he had conveyed confidential trade secret information to JLM and its affiliates, and that he had sent confidential material to a personal e-mail address for use apart from BIS, Tweedie and Gregerson terminated Robertson immediately.   (Gregerson Decl. ¶ 23.)

## V.    CAUSES OF ACTION

### BREACH OF DUTY OF LOYALTY
(AGAINST DEFENDANTS MASSEY AND ROBERTSON)

125.    BIS, without waiving the foregoing, realleges and incorporates the allegations set forth in paragraphs 1-124 above.

126.    Massey and Robertson owe and have breached their duty to their employer not to engage in disloyal acts in anticipation of future competition.

127.    In anticipation of future competition, and plans to work for JLM at the Buckeye Plant, Massey and Robertson engaged in disloyal acts by using for their own benefit and the benefit of JLM, confidential information acquired during the course of their employment, soliciting customers and soliciting other employees prior to the end of their employment.

128.    Both Massey and Robertson engaged in these disloyal acts in anticipation and furtherance of their future, and unfair competition against BIS.

129.    Massey acted to alienate Buckeye and its personnel from BIS in order to prompt Buckeye to put its maintenance contract out for bid.

130.    Massey solicited BIS personnel in Perry, Florida, and elsewhere, on behalf of JLM, and with an eye toward convincing Buckeye to award it contract to JLM.

131. Massey substantially contributed to the Buckeye RFP with the aim of shifting BIS' business to JLM.

132. Massey was involved in the review of proposals received in response to the Buckeye RFP and attempted to advance JLM's proposal, to the detriment of BIS and other bidders.

133. Robertson assisted Massey in alienating Buckeye personnel from BIS and in recruiting BIS personnel to apply for employment with JLM.

134. As a result of Massey's and Robertson's disloyal acts, Buckeye has cancelled its long-time contract with BIS, and JLM is poised to take BIS' employees to work immediately for JLM in the event that it is awarded the BIS contract.

135. Massey's and Robertson's disloyal conduct, aided and abetted by JLM, is causing immediate and irreparable injury to BIS for which there is no adequate remedy at law. BIS has been and continues to be damaged by Massey's and Robertson's actions and conduct in an amount that cannot be presently determined. BIS seeks injunctive relief to prevent future harm from Massey and Robertson, and JLM who has conspired with them and instigated this disloyalty, and monetary relief for harm that has already occurred or that cannot otherwise be remedied by injunctive relief.

**TORTIOUS INTERFERENCE**
**WITH CONTRACT AND BUSINESS RELATIONS**
(AGAINST MASSEY, ROBERTSON, AND JLM)

136. BIS, without waiving the foregoing, realleges and incorporates the allegations set forth in paragraphs 1-135 above.

137. BIS enjoyed an advantageous business relationship and contract with Buckeye and BIS' employees, of which Massey, Robertson, and JLM had knowledge.

138. By Massey's, Robertson's, and JLM's intentional and unjustifiable interference, BIS has been deprived of the advantageous business relationship and contract with Buckeye and BIS' employees.

139. Despite Massey and Robertson's knowledge of a contractual relationship between BIS and its employees, and Massey, Robertson, and JLM's knowledge of the existence of a contract with Buckeye, Defendants Massey, Robertson, and JLM intentionally, and without justification engaged in unfair and unlawful competition to interfere with those business relationships and contracts, resulting in damages resulting from the breach.

140. Massey's, Robertson's, and JLM's conduct is causing immediate and irreparable injury to BIS for which there is no adequate remedy at law. BIS has been and continues to be damaged by Massey's, Robertson's, and JLM's actions and conduct in an amount that cannot be presently determined. BIS seeks injunctive relief to prevent future harm from Massey, Robertson, and JLM, and monetary relief for harm that has already occurred or that cannot otherwise be remedied by injunctive relief.

**MISAPPROPRIATION OF TRADE SECRETS**
(AGAINST MASSEY, ROBERTSON, AND JLM)

141. BIS, without waiving the foregoing, realleges and incorporates the allegations set forth in paragraphs 1-140 above.

142. Defendants Massey, Robertson, and JLM misappropriated BIS trade secret information which were the subject of BIS' efforts to maintain the secrecy of in violation of the Florida Uniform Trade Secret Act ("UTSA"), Fla. Stat. § 688.001, *et seq*.

143. BIS' trade secret information derived its economic value from not being readily ascertainable by others, and was the subject of reasonable efforts to maintain its secrecy.

**VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR COMPETITION ACT**
(AGAINST MASSEY, ROBERTSON, AND JLM)

144. BIS, without waiving the foregoing, realleges and incorporates the allegations set forth in paragraphs 1-143 above.

145. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") was enacted to legitimate business enterprises from those who engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

146. Massey, Robertson, and JLM have engaged in deceptive and unfair trade practices that have caused BIS actual damages.

147. Massey's and Robertson's conspiracy with JLM to induce Buckeye to cease doing business with BIS and to transfer its business to its competitor JLM, along with Massey, Robertson, and JLM's misappropriation of BIS' confidential information and trade secrets constitute unfair or deceptive acts or practices under the broad reading Florida courts apply to the FDUTPA.

148. Massey's, Robertson's, and JLM's acts in unfair and deceptive competition were immoral, unethical, oppressive, unscrupulous, and substantially injurious to BIS.

**CONSPIRACY**
(AGAINST MASSEY, ROBERTSON, AND JLM)

149. BIS, without waiving the foregoing, realleges and incorporates the allegations set forth in paragraphs 1-148 above.

150. All Defendants were members of a common conspiracy. The object of the conspiracy was to accomplish an unlawful purpose: breach Massey's and Robertson's

obligations to BIS, theft of BIS trade secrets and other confidential, and tortiously interfering with BIS' contracts and business relationships, as described above.

151. Defendants had a meeting of the minds to engage in the course of action described above in order to further the business of JLM.

152. As described above, the Defendants committed the overt acts of breach of duties of loyalty, misappropriation of trade secrets and confidential information, and tortious interference with contract and business relations, all in furtherance of the conspiracy to unfairly and illegally acquire the Buckeye contract for JLM, and to raid BIS's employees to join JLM.

153. BIS suffered actual damages as a proximate result of Defendants' conduct.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff BIS requests that Defendants be cited to appear and answer, and respectfully requests that this Court award the following relief:

- Injunctive relief, first in the manner of a preliminary injunction, and finally as a permanent injunction, ordering as follows:
    - Massey and Robertson shall be prohibited from soliciting BIS employees by any form of contact, directly or indirectly, to induce them to terminate their employment with BIS and join the employ of any other entity;
    - Massey and Robertson shall be prohibited from working for JLM in any nature competitive with BIS due to their unfair and deceptive activities;
    - JLM shall be prohibited from soliciting BIS employees by any form of contact, directly or indirectly, to induce them to terminate their employment with BIS and join the employ of any other entity, or to hire them to compete with BIS at the Buckeye Plant;
    - JLM shall be prohibited from working for Buckeye at the Buckeye Plant in any nature competitive with BIS due to its unfair and deceptive activities;
    - Massey, Robertson, and JLM must immediately return all BIS property, including BIS confidential, proprietary, and trade secret information, and confirm the return of same by computer forensic analysis conducted by Plaintiff's analyst, at the Defendants' cost;

- Massey, Robertson, and JLM must make available for inspection by computer forensic analysis conducted by Plaintiff's analyst, any computers, external drives, email, or any other electronic media on which any BIS information and data is or has been stored; and

  - Massey, Robertson, and JLM shall be prohibited from working at Buckeye's Perry, Florida location due to their unfair and deceptive activities.

- Judgment against Defendants for a sum for compensatory damages to be proven in this litigation;

- Judgment against Defendants for a sum to be requested at trial of this matter representing exemplary and/or punitive damages for malicious, intentional and/or wrongful conduct;

- Costs and attorneys' fees;

- Prejudgment and post-judgment interest as provided by law;

- Jury trial on all issues so triable; and

- Such other and further relief to which BIS may be justly entitled.

Dated this 12th Day of March, 2013.

Respectfully submitted,

/s/ Robert J. Sniffen
**ROBERT J. SNIFFEN**
Florida Bar No. 0000795
E-mail: rsniffen@sniffenlaw.com

/s/ Maureen McCarthy Daughton
**MAUREEN MCCARTHY DAUGHTON**
Florida Bar No 655805.
E-mail: mdaughton@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*COUNSEL FOR BIS INDUSTRIAL SERVICES, INC.*

STATE OF FLORIDA

COUNTY OF TAYLOR

**VERIFICATION**

The undersigned, being first duly sworn, deposes and says that he is Southeast Regional Manager for Plaintiff BIS Industrial Services, Inc., that as such, he is authorized to make this Verification; that he has read and knows the contents of the foregoing Complaint; that the same are true and correct to the best of his knowledge, except as to those matters alleged upon information and belief, and as to those matters, he believes them to be true.

David Tweedie

SWORN TO and subscribed before me,
this the 12th day of March, 2013.

Jane E. Aman
Notary Public

JANE E. AMAN
Commission # EE 208886
Expires July 10, 2016
Bonded Thru Troy Fain Insurance 800-385-7019

My Commission Expires:
7-10-16

[SEAL]

JANE E AMAN